**UNITED STATES DISTRICT COURT**

**DISTRICT OF CONNECTICUT**


**MAGDALIZ L. NEGRON**,
       -Plaintiff


     -v-                                CIVIL 3:08 CV 182 (TPS)

**MALLON CHEVROLET, INC.**,
       -Defendant


MEMORANDUM OF DECISION

    For many, the experience of buying an automobile is almost as stressful as buying a house. Buyers frequently feel confused and overwhelmed by documents, forms, acronyms, unfamiliar terms, the sheer magnitude of their undertaking, and an uneasy feeling that the playing field may not be level. Nevertheless, people need transportation and so, each day thousands, if not millions, of such transactions take place, unremarkably. This lawsuit arises out of the plaintiff's purchase of a used car from the defendant dealership on May 18, 2007.  A bench trial was held September 28, 2010.  28 U.S.C. §636(c). The court finds for the plaintiff on her claims under the Truth in Lending Act (TILA), 15 U.S.C. §1601 et seq., and for the defendant on plaintiff's claims under the Connecticut Unfair Trade Practices Act ("CUTPA"), Conn. Gen. Stat. §42-110a et seq.  Judgment shall enter accordingly.

Rule 52(a) of the Federal Rules of Civil Procedure governs bench trials and requires that "the court must find the facts specially and state its conclusions of law separately."  The court's factual findings as set forth below are based on the court's perception of the credibility of the various witnesses who testified at trial, the exhibits, and relevant portions of the stipulations and depositions.  Although most of the court's findings are set forth in this portion of the opinion, occasionally subordinate factual findings are also made in the course of discussing the court's legal conclusions.  These findings are incorporated by reference herein.

## FACTS

The plaintiff is a citizen of Connecticut. On May 18, 2007, she bought a used 2004 Chevrolet Impala from the defendant Mallon Chevrolet, an automobile dealership located in Norwich, Connecticut. There is no diversity jurisdiction. The plaintiff and the defendant entered into a consumer credit transaction in connection with this transaction. The plaintiff is a consumer and the defendant was a creditor for purposes of the transaction. The plaintiff signed a purchase order and retail installment contract for the automobile. (Exhibits 3, 5)

At the time of this transaction, defendant Mallon Chevrolet was having a "Super Sale," in connection with which there had been a mass mailing of advertising material to about 30 thousand people in the area. (Frawley at 84)  To deal with the anticipated

crowds of customers, eight part-time workers (three managers and five salespeople) were brought in to help. (Frawley 84-86)  The defense witnesses uniformly maintain that any errors or misstatements in the information defendant obtained from Ms. Negron and inserted into the retail installment contract and financing papers must have been made by these part-time salespeople  who were brought on only temporarily to help with the "Super Sale."

None of the defense witnesses was able to identify any of these temporary workers, and no records as to their duties, identities or whereabouts were produced in discovery or introduced by the defendant. Mallon Chevrolet thus failed to keep records of the names of its temporary employees who prepared important documents pertaining to consumer lending, and the integrity of paperwork required by TILA, to say nothing of 18 U.S.C. §1014. It was Mallon's  responsibility to do this. This is a failing which the court is sure Mallon will not repeat in the future, but it is not the type or kind of an "error" that absolves Mallon of responsibility or liability for the TILA violations in this case.

At the relevant time, plaintiff was 23 years old, resided in her own apartment, paid her own rent, and worked part-time at a local motel as a breakfast room attendant.  She had held the job for about nine months, and earned around $9.25 per hour for a 25

hour week. She was having problems with her car, a 2000 Ford Taurus, which required significant repairs. She needed a more reliable automobile. So plaintiff went to Mallon Chevrolet, and brought her father, Victor Negron, with her for support and to help her pick a good vehicle at a reasonable price.

The plaintiff became interested in a used 2004 Chevrolet Impala with 41,555 miles. The price of the car was $13,550. She bought a 24 month service contract for $1,675 and a VIN etching service for $159. There was also a "dealer conveyance fee" of 4239. State sales tax was $733.18. An additional $95 fee was charged for transferring the title and lien. This brought the total cash price for the car to $16,451. The retail purchase order indicates that the plaintiff made a cash down payment of $250, which brought the unpaid balance of the cash price down to $16,201.18  A "GAP INS" charge of $800 was then added to the purchase price, bringing the balance owed to $17,001.18. The plaintiff financed the car with Wells Fargo Auto Finance, Inc. On a six year (72 month) payment plan, with payments of $379.58 per month. The annual percentage rate was 16.9%. The total finance charge was $10,328.58. According to the retail purchase order, the "Total Sale Price" for the used car was $27,579.76. (Plaintiff's Ex. 3)

The controversy before the court centers on the $250 "Down payment" that is reflected on the retail purchase order and the

retail instalment contract. Also at the center of the controversy are other alleged misrepresentations that were purportedly made to obtain financing for this transaction. At the outset, it should be noted that there is no dispute that plaintiff did not make a $250 down payment, and that the purchase order and retail instalment contract are wrong to the extent they reflect otherwise. The plaintiff alleges correctly that this skews the accuracy of the sales tax computation.  The amount of sales tax that plaintiff was charged on this fictitious down payment, therefore, was, in reality, part of the finance charge, which also is not disclosed in the instalment contract. The plaintiff makes other arguments how the erroneous listing of a $250 down payment violated TILA.

All a plaintiff need demonstrate is a single violation to be entitled to statutory damages of up to $1,000. Statutory damages do not increase with each additional violation that is shown. Therefore, there is no need for the court to address each of plaintiff's argument and their individual factual predicates. Here, the court finds that the listing of a $250 down payment, which was never made, violates TILA and entitles plaintiff to an award of statutory damages up to $1,000.  At the very least, this resulted in plaintiff's improperly being charged sales tax on a sum that was never paid.  The court does not necessarily reject plaintiff's other TILA arguments, but simply concludes that the

violation described above is sufficient.  Therefore, on the first count of the second amended complaint, judgment will enter in plaintiff's favor for $1,000, together with costs and reasonable attorney's fees to be determined at a later date.

The court has considered defendant's bona fide error defense, but is not convinced by it. To prevail on that defense, it must be shown that the violation was not intentional, resulted from a <u>bona</u> <u>fide</u> error "notwithstanding the maintenance of procedures reasonably adapted to avoid any such error." 15 U.S.C. 1640(c).  There is no need for the court at this point to discuss bona fides <u>vel</u> <u>non</u>, or the intent of the defendant, for, in the court's opinion, the defendant Mallon did not have in place "procedures reasonably adapted to avoid any such error." The court disagrees with Mallon's argument that the defense witnesses offered credible evidence to the contrary. In the court's view, Mallon's procedures at the time of its "Super Sale" were casual and sloppy. That defendants cannot even identify the additional sales and finance personnel who were present and participated in this transaction alone illustrates the court's point. These findings should suffice.

The more troubling part of this case is plaintiff's second count, which arises under the Connecticut Unfair Trade Practices Act ("CUTPA") Conn. Gen. Stat. §42-110a <u>et</u> <u>seq</u>.  Here, plaintiff alleges that the defendant deliberately falsified her credit

application to create the impression that she was "in a better financial position than she actually was." Plaintiff characterizes the listing of a $250 down payment as "bogus" and part of a scheme to defraud the financier and, presumably, the plaintiff herself.

Plaintiff begins with the premise that "Connecticut courts hold that a violation of TILA is a *per se* violation of CUTPA." For this proposition, plaintiff cites two cases <u>Cheshire Mtge. Service, Inc. v, Montez</u>, 223 Conn. 80, 612 A.2D 1130 (1992) and <u>McLaughlin Ford, Inc. v. Ford Motor Co.</u>, 473 A.2d 1185. Neither of these cases holds this, or even stands for the proposition. Instead, the court in <u>Cheshire Mtge. Service</u> states that "a violation of . . . TILA *may* constitute a violation of CUTPA." 612 A.2d at 1214. (Emphasis added). Whether a particular practice violates CUTPA is determined by analysis of the practice under the "Cigarette Rule" <u>Id</u>. At 1143[2]

The plaintiff asserts that her purchase of the used car from Mallon Chevrolet was a fraudulent transaction. According to plaintiff, the Mallon salesman she dealt with, Frank Williams

---

[2] In determining whether there has been a violation of CUTPA, Connecticut courts look to the "cigarette rule" of <u>FTC v. Sperry and Hutchinson Co.</u>, 405 U.S. 233, 244-45 n.5 (1972). <u>Cheshire Mortgage Service, Inc. v. Montes</u>, 612 A.2d 1130, 1143 (1992). The rule sets forth three criteria that should be considered. Since there has been a failure of proof in this claim, it seems unnecessary for the district court, which is entertaining the claim only incidentally, to discuss the intricacies of the Act.

falsified her credit application in order to get financing for the car. Plaintiff's credit application (Plaintiff's Ex. C) falsely states that she had been employed at Comfort Suites for three years.  It also states that her occupation there was as an assistant manager. It falsely describes herself as a salaried employee who was paid monthly, as opposed to a part-time hourly wage-earner. It misrepresented that she had been employed there for three years.

In reality, as plaintiff testified, she was a part-time assistant at breakfast time, had worked there only about 8 months, and was paid $9.25 per hour for about 25 hours per week. She was not an Assistant Manager, had not worked there three years, was not salaried, and did not make $2,650 per month. It is undisputed that the "Applicant's Credit Application" (Plaintiff's Exhibit C), is false.  It is also undisputed, and the court finds, that the plaintiff signed page three of the application. Above her signature appear words acknowledging that she has "read and agree[s] with the terms and disclosures of the three pages of this application." Id. At trial, plaintiff testified that the first two pages of the application were not attached to page three when she signed the credit application. Her signature signifies to the contrary: she read the application, she understood it, and she signed it.

The salesman with whom plaintiff dealt was Frank Williams.

Mr. Williams denies supplying the false information set forth on plaintiff's credit application.  According to Mr. Williams, this information is "input" by the Sales Manager and Finance Manager. The customer usually signs this document in the business office. Usually, according to Mr. Williams, a salesperson fills in a handwritten credit application and transmits it to the sales manager, who uses it to create a typed application. There is no such handwritten document in existence here. Mr. Williams does not know what happened to it in this case.  According to plaintiff, Mr. Williams told her the papers would be prepared to reflect a $250 down payment, even though she would not be required to pay it.  According to plaintiff, Mr. Williams told her that if the bank contacted her, she should lie and tell the bank that she had made a $250 down payment

Mr. Williams denies that he ever told the plaintiff to misstate her financial condition, and further denies telling her that a fictitious $250 deposit would be reflected in the retail instalment contract and other papers. Mr. Williams also denies advising the plaintiff to lie about these matter if she were contacted by the bank.

In the normal course of busines at Mallon, according to Mr. Williams, the paperwork and credit application then would have gone to Mallon's business manager, Karl Frawley.  Mr. Frawley testified that he "input" the numbers that appear on the first

page of the credit application. Mr. Frawley's recollection of the transaction was cloudy at best.  He stated that it looked to him like the $250 down payment had ben collected. He was adamant that he did not tell Ms. Negron or her father to lie about the down payment if contacted by a bank. It was Mr Frawley's recollection that this sale took place during a five day "Super Sale," for which several outside sales personnel and finance managers were brought in.  It was Mr. Frawley's belief that, to the extent errors were made, the mistakes were attributable to these temporary personnel. Mr. Frawley denied that the plaintiff or her father questioned him about the $250 down payment. Mr. Frawley also denies ever telling plaintiff to lie if contacted by the bank, and further denies ever counseling her to give false information on her financial statement.

    The plaintiff called her father, Victor Negron, as a corroborating witness. Mr. Negron did not remember any names and did not know the origin of the numbers on plaintiff's credit application. Mr. Negron, however, remembers that he inquired of someone about the $250 deposit and was told not to worry about it.  Mr. Negron also testified that he was told play along with it if the bank inquired.  From beginning to end, when plaintiff finally drove off in her new used car, the entire transaction took about six hours.  It is not clear how long Mr. Negron was at Mallon Chevrolet because, he testified, he was hungry and left to

get something to eat.  It is not clear whether he ever returned.

Thus, Mr. Negron, who was purportedly there *watching out* for his daughter, left his her alone to deal with people whom he allegedly knew had concocted a bogus $250 deposit scheme, and had urged both his daughter and him to lie about it should the bank call.  He purportedly left her because he was *hungry*, in effect abandoning his daughter to fend *alone* in a den of allegedly mendacious used car salesmen.  Mr. Negron did not impress the court. The court attaches no weight to Mr. Negron's testimony. His scant and sketchy testimony does not corroborate the plaintiff's allegations against Messrs. Williams, Frawley, and Griffin.

Jessie Griffin was unavailable at the time of trial and, therefore, his Rule 30(b)(6) deposition was admitted by agreement of counsel. Mr. Griffin testified that a day of so after the transaction, he discovered that the $250 down payment had not in fact been paid. (Tr. 14).  Instead of contacting the plaintiff and asking for the $250 down payment, Mr Griffin testified that "instead of having the customer come back into the dealership, {he] took the money out of the proceeds of the deal.  He never informed the plaintiff of the purported act of generosity. (Tr. 14)  He was not the sales manager for this particular transaction. (Tr. 20) The financial information for this sale was probably "inputted" by the sales manager. But there is no way

that Mr. Griffin or Mallon has the capability of going back into the records or data base to ascertain who the sales manager was for that particular transaction. (Tr.21-22)

It appears to be undisputed that defendant Mallon Chevrolet also issued a check for $275 to the plaintiff. Mr Griffin testified that, from his examination of the file, the $275 check was written to Magdaliz Negron "to help her with insurance." "For some reason," Mr Griffin testified, "she needed an additional $275 for her insurance." This is not reflected in the retain installment contract, however. It is not reflected because, according to Mr. Griffin, the $275 also came out of the gross profit of the deal (Tr.33-35). Thus, according to Mr. Griffin's sworn testimony there is no question that Ms. Negron agreed to pay a $250 down payment, but when he (Griffin) discovered the next day that she had not made the down payment, Mr. Griffin did not bother to ask her for it. Instead, he simply took it from Mallon's profit on the deal. Also, when it was discovered that Ms. Negron needed some "help" with her insurance, Mallon Chevrolet once again dipped into its own profit and issued Ms. Negron a check for $275, so she could obtain automobile insurance.(Tr. 35-40)  Mr. Griffin's testimony did not impress the court. It does not ring true.

What this case boils down to is a credibility contest between the plaintiff and two men: one a used car salesman, and

the other a used car sales manager. To argue that none of these three witnesses has a motive to lie is absurd. All three have a motive, or motives to lie.[3]

That plaintiff has sustained her burden of showing a violation of TILA is one thing, but proving her claim under CUTPA is an entirely different proposition. Mallon's breach of TILA, and the failure of its affirmative defense of bona fide error, do not compel the conclusion, or even reasonably suggest, that CUTPA also was violated by Mallon. The court finds that plaintiff has failed to sustain her burden of showing a violation of CUTPA. A finding of a breach of CUTPA should not be made lightly, and is not sustainable on this record.

Messrs. Williams and Frawley testified that they neither supplied the false information in plaintiffs loan application, nor encouraged the plaintiff to lie to the bank. This is in direct conflict with the plaintiff's testimony and that of her father. The court, therefore, must make a credibility determination. There is no magic formula from determining whom to believe. It is the quality of testimony, rather than the number of witnesses, that must be evaluated in deciding whom to believe. In evaluating plaintiff's credibility, the court considers her

---

[3]If the Court of Appeals desires more particularized findings as to this, or anything else, the magistrate respectfully asks that the matter be remanded for more detailed findings, which the magistrate will easily and gladly provide.

testimony that she signed the credit application. Immediately above her signature, the plaintiff acknowledge that she agreed with the terms and conditions of the three pages of the loan application. Thus, either plaintiff knowingly signed a false application, or recklessly signed a document without bothering to read the words above her signature and examine the entire document.  Thus, by her own admission plaintiff deliberately signed a document containing false information.

Messrs. Frawley and Williams, on the other hand, have denied that they deliberately supplied the false information on plaintiff's credit application, and further deny that they ever told the plaintiff or her father to lie in the event they were contacted by the bank. The Mallon witnesses also have come forward with at least a plausible explanation how the false information may have found its way into plaintiff's credit application. If plaintiff herself did not supply it- which is a possibility the court does not rule out-- then it must have been inserted by one of the unnamed and unknown group of sales and managerial people who were brought in temporarily to assist with the expected Super Sale crowds.  The plaintiff testified that she did not know who supplied the false financial data on the credit application he signed, but the fact remains that, by signing page three of the application, which said directly above her signature that she had read and agrees with the three pages of the

application, the plaintiff has cast doubt on her own character and credibility.

The plaintiff has the burden of proving her case by a preponderance of evidence. "The preponderance of the evidence standard requires the party with the burden of proof to support its position with the greater weight of the evidence." <u>Neutraceutical Corp. v. Von Eeschenbach</u>, 459 F.2d 1033 (10 Cir. 206). The court must consider the weight of the evidence.

> Indeed, "weight of the evidence" is often equated across circuits with a de novo inquiry into the preponderance of the evidence. *See, e.g., Nutraceutical Corp. v. Von Eschenbach*, 459 F.3d 1033, 1040 (10th Cir. 2006) ("The preponderance of the evidence standard requires the party with the burden of proof to support its position with the greater weight of the evidence."); *Jazz Photo Corp. v. United States*, 439 F.3d 1344, 1350 (Fed. Cir. 2006) (stating that "we have defined preponderance of the evidence in civil actions to mean 'the greater weight of evidence, evidence which is more convincing than the evidence which is offered in opposition to it.'") (citation omitted); . . . . . . . . , 160 F.3d 511, 523 n.9 (9th Cir. 1998) ("A preponderance of the evidence means the greater weight of the evidence. . . .

<u>De La Rosa v. Holder</u>, 598 F32 103 108 (2d Cir. 2010). Courts in Connecticut further hold that:

"Proof by a 'preponderance' mean that the petitioner must adduce evidence that makes the existence of a contested fact more likely than not." [citation omitted}   In other words, the

petitioner's proof needs only 'tip the scale' by the slightest evidentiary margins." McClenden v. Secretary of Dept. Of Health, 24 Cl.Ct. 329, 333 (1991). "[A] fact has been proved by a preponderance of the evidence if [the trier of fact] '[finds] that the scales tip, however slightly, in favor of the party with the burden of proof, as to that fact.'" Ostrowski v. Atlantic Mutual Insurance Companys, 968 F. 2d 171, 187 (2d Cir. 1992), citing, Sand, Model Federal Jury Instructions ¶73.01 at 73-74 (1992). Where the scales remain perfectly balanced, the plaintiff has failed to sustain her burden. Here, the plaintiff has not tipped the scales of credibility in her favor, the best she can assert is that they remain in equipoise. The same is true under the verbal formulation discussed in De La Rosa v. Holder, 598 F.3d 103, 108 (2d Cir. 2010). The plaintiff has not proved her CUTPA claim.  Accordingly, judgment shall enter in the defendant's favor on the second count of the supplemental complaint.

    Cadle v. Flanagan, 2006 WL 860063 (D.Conn. 860063, March 31, 2006) does not help the plaintiff here. In that case, which is of dubious precedential value, since it was settled pending appeal alleging several serious, outcome-determinative flaws in the record[4], and a generalized jury bias against the legal profession

---

[4]This magistrate conducted several settlement conferences during the life span of this law suit. Several occurred during the pre-trial phase, many while trial was in progress, and

as a whole. Moreover, as all facts and inferences in Cadle were construed in a light *least* favorable to the defendant attorneys *in that case,* it is not authority here, were there has been a bench trial, and the court must find the facts.

Having prevailed on her TILA claim, the plaintiff is entitled to an award of a reasonable attorney's fee. Accordingly, within 20 fays hereof plaintiff's counsel will file a duly supported fee application supported by affidavits delineating the hours spent; the hourly rate customarily charged in such cases; and other fee awards given to this attorney in Connecticut. The defendant shall have 20 days thereafter to present papers in opposition to aforesaid papers. Before submitting fee papers counsel are directed to discuss settlement of the fee issue. Any appeal from the court's decision herein should be timely and to the U.S. Second Circuit Court of Appeals. **IT IS SO ORDERED**

**Dated at Hartford, Connecticut this   30 th day of November, 2011.**

>  /s/ Thomas P. Smith
>  **Thomas P. Smith**
>  **United States Magistrate Judge**

---

multiple conferences after the jury returned its verdict. Unfortunately, a pre-trial settlement was not possible, and the result was a jury verdict which, in the magistrate's view, was unfair.